COURT OF APPEALS
DECISION
DATED AND FILED

February 8, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2022AP2084**

STATE OF WISCONSIN

Cir. Ct. No.  2007CF68

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

CASEY J. SHELTON,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Green County:  FAUN MARIE PHILLIPSON, Judge. *Affirmed*.

Before Blanchard, Nashold, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. Following a jury trial, Casey Shelton was convicted of reckless homicide in January 2009 in connection with the 2007 death

of his two-month-old son, Christopher. Shelton now appeals, pro se, a 2022 circuit court order denying his sixth and seventh motions for postconviction relief, filed pursuant to WIS. STAT. § 974.06 (2021-22), in what is Shelton's fourth appeal to this court in this case.[1] We conclude that all of his current claims are procedurally barred by past appellate or postconviction proceedings in which Shelton could have raised these claims or did raise them. *See State v. Escalona-Naranjo*, 185 Wis. 2d 168, 185, 517 N.W.2d 157 (1994) (claims that could have been raised on a prior direct appeal or postconviction motion from a criminal judgment of conviction cannot be the basis for a subsequent § 974.06 motion unless the court determines there was sufficient reason for failing to raise the claim in the earlier proceeding); *State v. Witkowski*, 163 Wis. 2d 985, 990, 473 N.W.2d 512 (Ct. App. 1991) (an appellant may not relitigate in a subsequent postconviction proceeding a matter previously decided on appeal). In addition, we conclude that he fails to show that this is the exceptional case meriting discretionary reversal on appeal.

## BACKGROUND

¶2 The following is a concise overview from a prior opinion of this court:

> Shelton was convicted by a jury of first-degree reckless homicide of his two-month old son, Christopher. On the evening of February 27, 2007, Shelton, who was alone with Christopher and his twin brother, Charles, called emergency services seeking medical assistance for Christopher, who Shelton reported was having difficulty breathing. Medical personnel were unable to resuscitate Christopher and he was pronounced dead at approximately

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

> 7:30 p.m. Shelton explained that while he was in the process of feeding Christopher, who had problems with keeping food down and projectile vomiting, Christopher started spitting up and then choking, and appeared to be fighting for air. However, expert testimony indicated that Christopher died as a result of a traumatic brain injury, "essentially the rattling of the brain inside the head," which occurred close in time to Christopher's death.

*State v. Shelton*, No. 2011AP52, unpublished slip op., ¶2 (WI App Nov. 15, 2012).

¶3    Following trial and while represented by counsel in October 2010, Shelton sought postconviction relief, and the circuit court held an evidentiary hearing consistent with *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979), and *State v. Curtis*, 218 Wis. 2d 550, 554, 555 n.3, 582 N.W.2d 409 (Ct. App. 1998) ("assuming there are factual allegations which, if found to be true, might warrant a finding of ineffective assistance of counsel, an evidentiary hearing is a prerequisite to appellate review of an ineffective assistance of counsel issue"). *See Shelton*, No. 2011AP52, ¶26. The circuit court denied the motion.[2] *Id.*, ¶5.

¶4    Still represented by counsel ("first postconviction counsel"), Shelton pursued a direct appeal. We denied this appeal in November 2012, rejecting Shelton's arguments that: (1) the circuit court at trial erroneously exercised its discretion in admitting evidence regarding Shelton's past conduct toward Christopher, his twin Charles, Amy Uptegraw (the infants' mother), Uptegraw's adolescent son, and Uptegraw's parents, including evidence that before Christopher's death Shelton had reacted angrily or violently when Christopher and Charles cried or vomited; (2) Shelton received ineffective assistance of trial

___

[2] The Hon. James R. Beer presided at trial and during the initial postconviction proceedings. The Hon. Faun Marie Phillipson issued the rulings challenged in this appeal.

3

counsel when counsel failed to request a limiting jury instruction regarding other-acts evidence and failed to raise a hearsay objection to the jury considering a partially redacted videotaped recording of a statement that Uptegraw made to police in April 2007 (our reasoning being that it was not "outside the wide range of professionally competent assistance" for counsel to decide not to object, following a strategy of exposing the jury to Uptegraw's demeanor as reflected in the recording, which contrasted with her demeanor on the witness stand); and (3) Shelton should be granted a new trial in the interest of justice based the presentation of inadmissible evidence. *Id.*, ¶¶1, 8, 25-27. In one part of our opinion, we explained that "the jury properly heard evidence that Shelton threw [Christopher's twin brother] to the ground" and that Shelton threatened Uptegraw on the way to the hospital after Christopher was reported injured, which we characterized as "very inculpatory evidence." *Id.*, ¶20.

¶5 In July 2013, Shelton, pro se, filed a second postconviction motion pursuant to WIS. STAT. § 974.06.[3] The circuit court denied the motion without holding an evidentiary hearing, ruling that all of the issues Shelton raised had been decided in this court's prior opinion. Shelton, again pro se, appealed, and in May 2014, we summarily affirmed the circuit court's denial of Shelton's second postconviction motion, which we identified as consisting of 14 arguments.[4] *See*

---

[3] Shelton did not have a constitutional right to counsel in proceedings that followed the resolution of his direct appeal. There is no constitutional right to counsel on a collateral attack and as a result the "vast majority" of WIS. STAT. § 974.06 motions are filed pro se. *See State ex rel. Wren v. Richardson*, 2019 WI 110, ¶27 & n.21, 389 Wis. 2d 516, 936 N.W.2d 587.

[4] We summarized the 14 arguments this way:

(continued)

4

*State v. Shelton*, No. 2013AP1817, unpublished slip op. and order (WI App May 9, 2014). Our opinion rejected some of the 14 arguments based on procedural bars and rejected others on the merits. *Id.*

¶6      While his pro se second postconviction motion was pending in this court, Shelton, pro se, filed in this court a petition for a writ of habeas corpus,

> (1) trial counsel should have solicited testimony from two witnesses who allegedly observed Amy Uptegraw and her parents, Ron and Cindy Uptegraw, perpetuate physical and verbal abuse on Amy's children; (2) trial counsel should have objected to demonstrative evidence in which an expert witness used a doll to show potential ways [Christopher] could have been injured; (3) trial counsel should have requested a change of venue due to pretrial publicity; (4) trial counsel should have moved to strike a number of jurors for cause; (5) trial counsel should have moved to suppress autopsy photos and the death certificate as unduly prejudicial, and raised a hearsay objection to a videotaped recording of the statement [Uptegraw] made to police; (6) trial counsel should have requested a cautionary instruction regarding the limited use of other acts evidence; (7) the prosecutor failed to turn over potentially exculpatory evidence, including Shelton's 911 call and hospital records that contradicted testimony given by the State's witnesses; (8) the prosecutor elicited false testimony regarding the chain of custody of [Christopher's] clothing, as evidenced by the hospital records; (9) the prosecutor offered personal opinions, vouched for witnesses, and called for impermissible inferences from character evidence during his closing argument; (10) the admission of other acts evidence violated not only State evidentiary rules (as argued on Shelton's prior appeal), but also federal rules and constitutional principles; (11) the circuit court should have excluded evidence relating to prior injuries to [Christopher]; (12) the evidence was insufficient to establish Shelton's guilt beyond a reasonable doubt because there was not even certainty as to the exact cause of death, much less what actions had led to it; (13) the lack of evidence beyond other acts relieved the State of its burden of proof; and (14) the cumulative effect of these errors deprived Shelton of his constitutional due process rights.

*State v. Shelton*, No. 2013AP1817, unpublished slip op. and order (WI App May 9, 2014) (footnote omitted).

consistent with *State v. Knight*, 168 Wis. 2d 509, 520, 484 N.W.2d 540 (1992). In this petition, Shelton alleged that his appellate counsel in the direct appeal was constitutionally ineffective in failing to challenge in this court: the relevance of other-acts evidence that Shelton had thrown Charles to the floor in reaction to Charles spitting up; the admission of evidence about other injuries to Christopher, on the theory that they were sustained during resuscitation efforts; and the sufficiency of the evidence. *State ex rel. Shelton v. Schwochert*, No. 2013AP2073-W, unpublished slip op. and order (WI App Dec. 10, 2013). In December 2013, we denied Shelton's habeas petition. *Id.* In that opinion, we noted that appellate counsel had in fact challenged the admission of all evidence related to Shelton's alleged mistreatment of Christopher and Charles. *Id.* We also stated that we had already explained in resolving the direct appeal that

> the fact that [Christopher] suffered a fatal brain injury while in the exclusive care of Shelton—coupled with evidence that Shelton had a plausible motive for inflicting violence on the child and that Shelton had threatened on the way to the hospital to kill the family of [Christopher's] mother if she said anything—provided strong evidence that Shelton had recklessly caused his son's death.

*Id.* Our supreme court denied Shelton's petition for review in June 2014. *Shelton v. Schwochert*, 2014 WI 50, 354 Wis. 2d 864, 848 N.W.2d 860 (unpublished order).

¶7     Against that backdrop, beginning in May 2015 Shelton filed the first of two motions that are at issue in this appeal. Assisted by attorneys ("the second postconviction counsel"), Shelton filed a second motion for a new trial pursuant to WIS. STAT. § 974.06. After the circuit court granted several extensions of time to the second postconviction counsel to allow them to gather additional evidence, second postconviction counsel supplanted the May 2015 motion with an amended

6

version filed in May 2017 ("the 2017 motion"). In February 2022, with the 2017 motion still unresolved in the circuit court, different counsel ("third postconviction counsel") filed a supplemental motion for a new trial on Shelton's behalf ("the 2022 motion"). After considering written and oral arguments by the parties, and deeming there to be no need for an evidentiary hearing, the circuit court in September 2022 denied both motions in a detailed, 22-page opinion. Shelton, pro se, appeals.

## DISCUSSION

¶8      We now summarize the legal standards creating the procedural bars at issue and then address the 2017 and 2022 motions in turn.

### I.      Legal standards

¶9      In addition to the direct appeal process, prisoners may collaterally attack their sentences based on alleged constitutional violations. *See* WIS. STAT. § 974.06(1)-(2). Under § 974.06(4), however, all such claims must be "consolidate[d] … into one motion or appeal." *Escalona-Naranjo*, 185 Wis. 2d at 178.[5] Under this rule, all issues that were or could have been raised in such a

---

[5] WISCONSIN STAT. § 974.06(4) provides in its entirety:

> All grounds for relief available to a person under this section must be raised in his or her original, supplemental or amended motion. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the person has taken to secure relief may not be the basis for a subsequent motion, unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the original, supplemental or amended motion.

motion or direct appeal are procedurally barred, unless the defendant provides "sufficient reason" for not raising the issues in the earlier proceeding. *Id.* at 173, 185 ("constitutional claims which could have been raised on direct appeal or in a [WIS. STAT. §] 974.02 motion cannot later be the basis for a [§] 974.06 motion"). The procedural bar, including the "sufficient reason" requirement, creates incentives for issues to be decided while memories are still fresh and witnesses and records are still available, and also aims to limit abuses of the appellate process. *See id.* at 185-86.

¶10 A claim brought under WIS. STAT. § 974.06 is also barred if it has been finally adjudicated during a previous appeal. *Escalona-Naranjo*, 185 Wis. 2d at 181-82. "We need finality in our litigation." *Id.* at 185. "A matter once litigated may not be relitigated in a subsequent postconviction proceeding no matter how artfully the defendant may rephrase the issue." *Witkowski*, 163 Wis. 2d at 990.

¶11 We review de novo whether a claim under WIS. STAT. § 974.06 is procedurally barred. *State v. A. Allen*, 2010 WI 89, ¶15, 328 Wis. 2d 1, 786 N.W.2d 124. Similarly, whether a defendant offered the circuit court a sufficient reason to avoid the procedural bar is also an issue of law subject to de novo review. *State v. Kletzien*, 2011 WI App 22, ¶16, 331 Wis. 2d 640, 794 N.W.2d 920. We determine the sufficiency of an offered reason to avoid the bar by examining the four corners of the postconviction motion. *See State v. J. Allen*, 2004 WI 106, ¶¶9, 27, 274 Wis. 2d 568, 682 N.W.2d 433. Postconviction motions contain sufficient and nonconclusory material facts when the motions set forth the "five 'w's' and one 'h'; that is the who, what, where, when, why and how, that, if true, entitle them to relief." *Id.*, ¶23.

¶12    "In some instances, ineffective assistance of postconviction counsel may be a sufficient reason for failing to raise an available claim in an earlier motion or on direct appeal." *State v. Romero-Georgana*, 2014 WI 83, ¶36, 360 Wis. 2d 522, 849 N.W.2d 668.  However, a defendant who represents himself or herself in a proceeding, as Shelton did here in his July 2013 second postconviction motion, "cannot thereafter complain that the quality of his own defense [in that proceeding] amounted to a denial of 'effective assistance of counsel.'"  *See Faretta v. California*, 422 U.S. 806, 834 n.46 (1975).  Therefore, it is not a sufficient reason for failing to raise an issue in a prior WIS. STAT. § 974.06 motion that it would have been constitutionally ineffective for counsel, had there been one, to fail to raise that issue.

## II.    The 2017 Motion

¶13    The 2017 motion filed by second postconviction counsel contained three closely related arguments.  Each was based on the medical evidence that was introduced at his trial and the prospect of Shelton offering additional or different newly discovered medical evidence at a new trial that:  (1) trial counsel was constitutionally ineffective in failing to collect and present to the jury "objective medical evidence that substantially undermined the State's theory" at trial that Shelton caused a head injury to Christopher, resulting in Christopher's death; (2) new evidence "in the form of new medical and scientific research conducted and published since trial" warrants a new trial; and (3) Shelton is entitled to a new trial in the interest of justice because the real controversy, involving "the mechanism and cause of Christopher's death, was not fully tried."  Shelton contended that trial counsel was constitutionally ineffective and that he is entitled to a new trial based on the newly discovered medical evidence and in the interest of justice.  In support, Shelton alleged that trial counsel should have investigated

and made use of the following: "red flags in Christopher's medical history" that would have allowed the jury to understand that he was "seriously compromised"; evidence that Christopher was deprived of sufficient oxygen on the day of his death due to misplacement of an endotracheal intubation device by emergency responders; autopsy evidence about aspirated formula, allegedly consistent with Shelton's version of events; and expert evidence to counter the potential effects on the jury of the theory testified to by the forensic pathologist called by the State that, contrary to Shelton's theory, a bilateral subdural hemorrhage in Christopher's brain identified at the autopsy was not the cause of his death.

¶14    We first address the procedural bar issue regarding the 2017 motion before we address the argument in the 2017 motion that we should reverse for a new trial in the interest of justice.

A. *WIS. STAT. § 974.06 Claims*

¶15    The circuit court ruled in pertinent part that the 2017 motion must be denied based on procedural bars because Shelton raised or could have raised the issues in his prior post-conviction motions. We affirm this ruling on the ground that, to the extent that Shelton's prior direct appeal and postconviction motions did not raise these issues, he could have raised them in the second postconviction motion in July 2013 and he fails to identify a sufficient reason for not doing so.[6]

¶16    The substance of the 2017 motion itself strongly supports application of the procedural bar. In the 2017 motion, Shelton strenuously argued that first

---

[6] The 2017 motion makes reference to "postconviction counsel's ineffectiveness," but the July 2013 motion was filed pro se, and therefore the sufficient reason cannot be based on ineffective assistance of counsel.

postconviction counsel had available information *in 2012* that should have caused first postconviction counsel "to investigate the medical evidence that was presented at trial" and "raise a claim of trial counsel's ineffectiveness in presenting evidence to rebut the State's medical evidence."  According to the 2017 motion, this included information available in 2012 "that the medical hypothesis underlying the Shaken Baby Syndrome and Abusive Head Trauma diagnosis was controversial," and that "critical prenatal records were not in trial counsel's files."

¶17     The 2017 motion provides ample support for the proposition that the medical evidence at issue was available by July 2013 when Shelton filed his pro se second postconviction motion.  The 2017 motion includes the following two sources:  what the 2017 motion describes as "widely cited meta-analysis" released in 2009 that sought "to determine which clinical features are indicative of inflicted, abusive head trauma in children and which are not"; and a 2011 article that was, according to the 2017 motion, a "meta-analysis of 24 previously published studies" seeking "to determine which clinical and radiographic characteristics are associated with abusive head trauma and which are associated with nonabusive head trauma."[7]  In reference to these studies, the 2017 motion asserts that medical testimony elicited by the prosecution at trial was "disproved by subsequent meta-analysis."

¶18     In addition, one expert who provided opinions that the second postconviction counsel attached to the 2017 motion cited two relevant articles published in 2011:  one entitled, "Biomechanical evaluation of head kinematics

---

[7] As the 2017 motion explains, a meta-analysis combines and synthesizes data from multiple previously published studies.

during infant shaking versus pediatric activities of daily living," and the other entitled, "Pyloric stenosis as a cause of venous hypertensive syndrome mimicking true shaken baby syndrome."[8]

¶19    Further, the publicly available information in July 2013, when Shelton filed the second postconviction motion, included ***State v. Edmunds***, 2008 WI App 33, 308 Wis. 2d 374, 746 N.W.2d 590. In ***Edmunds***, this court ordered a new trial based on a claim of newly discovered evidence because evidence was presented of what the court characterized as a "shift in mainstream medical opinion" regarding shaken baby syndrome. ***Id.***, ¶23; *see also **id.***, ¶6 (describing newly discovered evidence that consisted of six expert witnesses, whom the court characterized as testifying that "there is now a significant debate in the medical community" concerning the diagnosis or characterization of shaken baby syndrome).

¶20    Related to ***Edmunds***, also publicly available in July 2013 was D. Tuerkheimer, *The Next Innocence Project:  Shaken Baby Syndrome and the Criminal Courts*, 87 Wash. U.L. Rev. 1 (2009). This 2009 article focused extensively but not exclusively on the ***Edmunds*** case. It included citations to support the position that "scientific study has generated new explanations for the

---

[8] One portion of the 2017 motion is devoted to the argument that "trial counsel's failure to consult with an expert regarding the significance of Christopher's undiagnosed pyloric stenosis" (a thickening of the opening between the stomach and small intestine that can cause symptoms such as vomiting after feeding in infants) was constitutionally ineffective because counsel could have shown that this condition "may have been the cause of the subdural hematoma found at" Christopher's autopsy. However, as the circuit court noted in denying the 2017 motion, the record establishes that "as far back as" June 2009 Shelton was aware of the potential for the phenomenon of pyloric stenosis to be featured in a defense.

presence of subdural hematomas" in deceased infants. *Id.* at 17 & n.104.[9] The 2009 article also summarized a Massachusetts prosecution in which, according to the article, the prosecution's theory of shaken baby syndrome was successfully undermined by an alternative defense theory, based on newly discovered medical evidence. *See id.* at 15 n.91. The defense theory was that "massive intracranial bleeding, brain swelling, and a retinal hemorrhage" in an eight-month-old who had died was not caused by violent shaking by the defendant, but instead "was caused by a 're-bleed' of a chronic brain clot resulting from an undetected injury." *Id.* Under this alternative theory, "the baby had a chronic blood clot which re-bled" merely as a result of "'rough' handling by" the defendant. *See id.*

¶21 More generally, a number of the core points made in the 2009 article are at the heart of the claims that Shelton raised in the 2017 motion. To cite just one example, the 2017 motion argues, "Had trial counsel presented evidence that it is common for there to be a lucid interval between the onset of the diffuse brain injury and the collapse, the jury would not have necessarily tied the brain injury to Mr. Shelton, even if they did believe the injury was due to abuse." One subsection

---

[9] For this proposition, the 2009 article cited the following authority from 2002, 2008, and 2009:

> Marta C. Cohen & Irene Scheimberg, *Evidence of Occurrence of Intradural and Subdural Hemorrhage in the Perinatal and Neonatal Period in the Context of Hypoxic Ischemic Encephalopathy*, 12 PEDIATRIC DEVELOPMENTAL PATHOLOGY 169 (2009); Julie Mack et al., *Anatomy and Development of the Meninges: Implications for Subdural Collections and CSF Circulation*, 39 PEDIATRIC RADIOLOGY 200 (2009) (on file with author); Eva Lai Wah Fung et al., *Unexplained Subdural Hematoma in Young Children: Is it Always Child Abuse?*, 44 PEDIATRICS INT'L 37 (2002); V.J. Rooks et al., *Prevalence and Evolution of Intracranial Hemorrhage in Asympotomatic Term Infants*, 29 AM. J. NEURORADIOLOGY 1082 (2008).

of the 2009 article highlights a medical opinion that cast doubt on previously given expert testimony that "foreclosed the possibility that prior accidental injury caused an infant's later symptoms," based on "lucid interval studies" that "support the notion of a lag time" between injury-causing events and the onset of symptoms. *See id.* at 18-19.

¶22 In addition to all of this available information, as the 2017 motion pointed out, in 2012

> a team of leading legal scholars collaborated with medical experts and published an article addressing the ongoing debate regarding diagnoses of abusive head trauma. Keith A. Findley et al., *Shaken Baby Syndrome, Abusive Head Trauma, And Actual Innocence: Getting it Right*, 12 HOUS. J. HEALTH L. & POL'Y 209 (2012).[10]

¶23 Shelton's pro se briefing in this appeal is sometimes difficult to track. But between assertions and references in his current briefing and what is stated in the 2017 motion, he offers only the following limited arguments to support a determination that, to the extent his current claims are not procedurally barred because they were already litigated in a prior appeal, he had sufficient reason for not raising them in the second postconviction motion in 2013.

¶24 The 2017 motion asserts that, "[a]s a pro se petitioner, [Shelton] lacked the ability and resources to obtain all the medical records and consult with experts, which was necessary to rebut the State's medical diagnosis of murder." In a similar vein, in his briefing on appeal, Shelton points out that he "is not a

---

[10] The State belittles the merits of this 2012 article, in part on the ground that its lead author was co-director of the organization of attorneys that would later represent Shelton when the 2017 motion was filed. But for our purposes the point is not how correct or incorrect the 2012 article was in presenting any particular point of view or assertion. The point is that in July 2013 Shelton could have cited the 2012 article and its various references.

medical expert," and asserts that it was not until he had the benefit of representation by second postconviction counsel that he obtained "the resources for the medical issues to get looked into appropriately and the facts of the impeachment claims for various reasons [that] were yet to be exposed."

¶25     But the 2017 motion fails to explain what particular lack of "ability" or lack of "resources" Shelton labored under that prevented him from pursuing issues in July 2013 that he himself asserted in the 2017 motion his attorney should have pursued in the direct appeal. That is, the motion fails to show how Shelton was hindered in obtaining relevant information through reasonable efforts at any time before July 2013. More generally, these blanket assertions do not constitute a sufficient reason for failing to pursue this defense in July 2013. *See Romero-Georgana*, 360 Wis. 2d 522, ¶53 ("Since the [WIS. STAT.] § 974.06 motion does not offer a sufficient reason for failing to bring the current claim in the second postconviction motion, Romero-Georgana's motion is barred under § 974.06(4) and *Escalona-Naranjo*."). Put differently, the circuit court was free to reject the limited allegations in the 2017 motion on the sufficient-reason topic as conclusory and insufficiently describing the "who, what, where, when, why, and how" of Shelton's lack of ability and resources to pursue the claims of the 2017 motion when he prepared the 2013 motion. *See J. Allen*, 274 Wis. 2d 568, ¶23.

¶26     We assume without deciding that in another case a defendant might be able to identify a sufficient reason based in part on the defendant's particular circumstances, which could include pro se status, if properly alleged and supported with sufficient material and nonconclusory facts in a postconviction motion. But, even with that assumption about the meaning of "sufficient reason" in the context of the procedural bar, the motion here does not suggest that Shelton actually made reasonable efforts to obtain and make use of information that were

hindered in any way, or that his circumstances did not allow him to be exposed to developments on the topic of alleged fatal head trauma to infants. It is true that the medical evidence at issue here has complex aspects. Still, as the 2017 motion strenuously argued, the sources cited above unambiguously and directly challenged prosecutions based on allegations of abusive head trauma to infants. Mere pro se status and vague references to inability and lack of resources cannot be enough. Otherwise, the "sufficient reason" standard would swallow the procedural bar established by WIS. STAT. § 974.06 as interpreted by our supreme court—pro se defendants could file postconviction motions without end.

¶27     It is true that Shelton, in 2013, would have needed to mold the general assertions made in legal reviews and medical journals into a set of arguments reasonably tailored to this case. But he fails to direct us to allegations in the 2017 motion explaining why he apparently did not, before filing his postconviction motion in 2013, even attempt to seek to rely on the information predating 2013 that, as his 2017 motion extensively cites, was available in the ordinary sources that one would consult for developments in forensic science.

¶28     As the circuit court noted in denying the 2017 motion, while the motion relies on some potential sources of medical evidence regarding the mechanism of Christopher's death that may not have been available at the time of the jury trial, Shelton was well aware no later than the time of trial of the potential for a post-conviction defense based in part on new medical evidence. This is because the trial included, as the circuit court noted,

> dueling medical experts and their opinions regarding cause of death, Christopher's difficult delivery…, the fact that [Christopher] was premature and 'biologically' only one and a half months old, cross-examination by defense counsel of the State's medical expert concerning hypoxia,

16

> anoxia and rib fractures, and evidence pertaining to Amy Uptegraw's reputation as a 'liar.'[11]

For example, the forensic pathologist called as a witness by the prosecution at trial testified that he could rule out non-abusive explanations of Christopher's bilateral subdural hematoma in part based on the view that "[t]he only way to get" that type of hematoma "is by a head injury." To the contrary, the defense expert testified that the most likely cause of the bilateral subdural hemorrhage was damage to the dural venous plexuses (the group of sinuses or blood channels that drains venous blood circulating from the cranial cavity) rather than bridging vein ruptures (as the result of head trauma). At minimum, Shelton knew from the nature of this debate at trial that any newly developed insights or newly discovered evidence that involved proof of a mechanism of brain injury or damage that differed from the State's theory of injury would be relevant to potential collateral attacks on the judgment of conviction. Similarly, the circuit court also observed that Shelton knew from his relationship with Uptegraw what her "lifestyle" was while she was pregnant with the twins and about "the twins' difficult delivery." As the State now points out, Uptegraw testified at trial that Shelton resided with her starting in November 2006. Thus, to the extent the 2017 motion is based on medical information about the pregnancy and Christopher's birth, it undermines Shelton's position that he lacked awareness of this information in 2013.

¶29    Shelton suggests in his reply brief that this case presents the unusual circumstance in which the procedural bar should not apply because it would have been impossible for him to have raised these issues in July 2013. He asserts that

---

[11] "Cerebral hypoxia occurs when your brain doesn't get enough oxygen. A related condition, anoxia, occurs when no oxygen reaches the brain." *Cerebral Hypoxia*, https://my.clevelandclinic.org/health/diseases/6025-cerebral-hypoxia (last visited Feb. 6, 2024).

his situation is akin to one in which a defendant seeking postconviction relief demonstrates a need to obtain new forensic testing, such as a search for DNA, in order to pursue a valid issue. He fails to support the analogy. Here, the 2017 motion does not explain why Shelton's 2013 motion could not have cited any or all of the sources laid out in the 2017 motion and, on that basis, could have requested an evidentiary hearing to address those issues. This did not require new forensic testing that he could not reasonably have obtained. Shelton's reply brief suggests that there were roadblocks preventing him from raising these issues in 2013, including the difficulty of consulting experts without the assistance of counsel. However, the 2017 motion does not allege material facts and explain with sufficient clarity what roadblocks existed to require an evidentiary hearing, particularly given that Shelton was able to later obtain counsel who was able to secure expert review of relevant medical records. For example, the 2017 motion does not clearly specify whether Shelton in 2013 was unaware of the factual or the legal basis for his current claims.

¶30 For all these same reasons, Shelton fails to set forth a sufficient factual basis for failing to present in the second postconviction motion in 2013 the medical evidence claim that he would raise in the 2017 motion.

¶31 Because the procedural bar applies to the 2017 motion, the circuit court appropriately declined to hold an evidentiary hearing regarding the allegations in the motion.

*B. Interest of Justice*

¶32 As noted, the 2017 motion also seeks reversal of Shelton's judgment of conviction by this court in the interest of justice. Our supreme court stated in *State v. Avery*, 2013 WI 13, ¶38 n.17, 345 Wis. 2d 407, 826 N.W.2d 60, that

contrary to the apparent meaning of *State v. G. Allen*, 159 Wis. 2d 53, 464 N.W.2d 426 (Ct. App. 1990), we may reverse a criminal conviction in the interest of justice on a motion made under WIS. STAT. § 974.06. *See Avery*, 345 Wis. 2d 407, ¶38 ("The supreme court and the court of appeals may set aside a conviction through the use of our discretionary reversal powers, though the circuit court does not have such discretionary powers."); *see also State v. Armstrong*, 2005 WI 119, ¶113 & n.25, 283 Wis. 2d 639, 700 N.W.2d 98 (questioning the reasoning in *G. Allen* although not overruling *G. Allen*). This is so, whether we reverse under WIS. STAT. § 752.35, the discretionary reversal statute that applies to the court of appeals, or under any inherent power that this court might have in this context. *Avery*, 345 Wis. 2d 407, ¶38 n.17 ("The discretionary reversal power of this court and the court of appeals is coterminous.").

¶33    The court in *Avery* stated:

> This court may grant a new trial in the interest of justice (1) whenever "the real controversy has not been fully tried," or (2) whenever "it is probable that justice has for any reason miscarried." WIS. STAT. § 751.06[, the discretionary reversal statute that applies to the supreme court]. Cases where the real controversy has not been fully tried have generally been limited to two situations: (1) when the jury was erroneously denied the opportunity to hear important evidence bearing on an important issue in the case or (2) when the jury had before it evidence not properly admitted that "so clouded" a crucial issue that it may be fairly said that the real controversy was not tried. [*State v. Hicks*, 202 Wis. 2d 150, 160, 549 N.W.2d 435 (1996)].

*Avery*, 345 Wis. 2d 407, ¶38 n.18.

¶34    Shelton may intend to focus primarily on the "not been fully tried" prong, under which a new trial is merited "if the jury was not given the opportunity to hear and examine evidence that bears on a significant issue in the

case, even if this occurred because the evidence or testimony did not exist at the time of trial." ***State v. Maloney***, 2006 WI 15, ¶14 n.4, 288 Wis. 2d 551, 709 N.W.2d 436 (citing ***Hicks***, 202 Wis. 2d at 160-61). "[S]uch discretionary reversal power is exercised only in 'exceptional cases,'" only "'infrequently and judiciously.'" ***Avery***, 345 Wis. 2d 407, ¶38 (quoted sources omitted).

¶35 Bearing these standards in mind, we cannot say that this is the exceptional case, particularly in light of the non-medical evidence that we have characterized in a prior appeal as "very inculpatory evidence," *see* ***Shelton***, No. 2011AP52, ¶20. Shelton fails to come to grips with this evidence in his current appeal. His argument is based in large part on the assertion that medical testimony elicited from the forensic pathologist by the prosecution was, in Shelton's words, "later determined to be inconsistent with the facts." But Shelton fails to adequately support that assertion with citation to evidence presented in the 2017 motion. This is critical. As Shelton had to admit in the 2017 motion, there was, in fact, competing expert testimony at trial, not one-sided testimony. As a result and to satisfy ***Avery***, he must now direct us to evidence bearing on a significant issue that was not presented through that expert trial testimony. To that end, his briefing on appeal makes only passing references to evidence, either from trial or alleged in the 2017 motion, bearing on the issue of whether Christopher could have died as a result of aspiration or an intubation failure. Shelton does not now develop supported arguments based on trial evidence or postconviction motion allegations.

¶36 Shelton's argument is more developed on the topic of whether new medical evidence could help him undermine the concession made by the defense expert at trial that the volume of the subdural hemorrhage in the bilateral hematoma in Christopher's brain was not sufficient to cause brain damage and

therefore not the cause of Christopher's death. Shelton's new argument, supported by new medical evidence, would be that the volume of the hemorrhage was sufficient to cause Christopher's death and that this volume accumulated over time through a mechanism that would not inculpate Shelton, because it was caused by an injury weeks before Christopher died. More specifically, what may be Shelton's strongest argument focuses on opinions provided by a neuropathologist, newly retained for purposes of the 2017 motion. The neuropathologist opined that Christopher had a greater volume of subdural hemorrhage in the bilateral hematomas than was testified to by the forensic pathologist called by the State at trial. According to the neuropathologist, this is a significant fact because this greater blood volume could support a determination that a relatively benign blow to Christopher's head some weeks before his death could have "caused a subdural hemorrhage that evolved to become a significant issue for this child."

¶37 But even with the benefit of that particular argument, Shelton fails to persuade us in his current briefing that a jury presented with all of the same evidence at a new trial (both medical and non-medical), with the addition of post-conviction pro-defense medical testimony and potential impeachment of the forensic pathologist who was called by the State at trial, would present the "real controversy" for the first time, or would be the first trial in which justice would not be miscarried. Shelton would still face the "very inculpatory evidence" pointing strongly toward a tragically violent demise for Christopher at Shelton's hands.

¶38 Shelton alleges that a jury needs to hear "the truthful story that the State has worked extra hard to cover up and keep that way," through "lies and deception," but he fails to describe any form of cover up or deception.

### III. The 2022 Motion

¶39    Third postconviction counsel argued that Shelton is entitled to present "new evidence" involving records of child in need of protection or services (CHIPS) proceedings involving Uptegraw's children and the recording of a statement Uptegraw made to police on March 19, 2007. Shelton submits that this evidence "strongly suggests that Amy [Uptegraw] falsely accused [Shelton] of abuse in an effort to regain custody of her three living children."[12] The argument is that the "new evidence" would bolster a defense argument at a new trial that Uptegraw falsely implicated Shelton in Christopher's death because this would put Shelton in a bad light, under the rationale that this could help Uptegraw win or retain custody of her children. But as the circuit court emphasized in denying the 2022 motion, these topics were in play during the 2009 trial (notably, a primary defense strategy at trial was an attempt to undermine Uptegraw's credibility) and Shelton fails to provide a sufficient reason for his failure not to raise these issues in July 2013. And, as the circuit court further pointed out, the record shows that Shelton referred to the March 19, 2007 police interview with Uptegraw as far back as June 2009, years before he filed his July 2013 postconviction motion.[13]

---

[12] As the State points out, the 2022 motion does not contain a "newly discovered evidence" claim, but instead third postconviction counsel speaks in terms of "newly available evidence," which is presented exclusively in the context of a claim of ineffective assistance of trial counsel, a purported **Brady** violation, and a request for a new trial in the interest of justice. *See* **Brady v. Maryland**, 373 U.S. 83 (1963) (suppression by the government of material evidence favorable to a defendant violates the defendant's right to due process). Therefore, the law governing claims of newly discovered evidence does not apply.

[13] For this reason, Shelton is also procedurally barred from raising a claim regarding the March 19, 2007 police interview of Uptegraw based on **Brady** (suppression by the government of material evidence favorable to a defendant violates the defendant's right to due process), as he attempts to do in the 2022 motion.

¶40    Because the procedural bar under ***Escalona-Naranjo*** applies to the 2022 motion, the circuit court appropriately declined to hold an evidentiary hearing regarding its allegations.

## CONCLUSION

¶41    For all these reasons, we affirm the circuit court's denial of the 2017 and 2022 postconviction motions.

*By the Court*.—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.